IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

EQUAL EMPLOYMENT OPPORTUNITY )
COMMISSION, )
 )
    Plaintiff, )
 )
v. )
 )    No. 00-2923 Ma/A
 )
AUTOZONE, INC., )
 )
    Defendant. )
 )

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

---

    Before the court is Defendant Autozone, Inc.'s ("Autozone")
motion for summary judgment, filed on July 8, 2005. Plaintiff
Equal Employment Opportunity Commission ("EEOC") filed a response
on July 25, 2005. On August 22, 2005, Autozone filed a reply in
support of summary judgment, and the EEOC filed a surreply on
August 26, 2005. For the following reasons, the court GRANTS in
part and DENIES in part Defendant's motion for summary judgment.

**I. Background**

    Plaintiff EEOC brings this action under Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.
("Title VII"). The complaint, filed on September 29, 2000,
alleges that Autozone "[I] failed to hire Black applicants for

1

official/manager positions because of their race; [II] failed to hire female applicants for official/manager, technician and service worker positions because of their sex; [III] failed to promote Black and female employees into official/manager positions; and [IV] failed to comply with the record keeping requirements of Title VII." (Compl. 1.) The pattern or practice claims of failure to hire female applicants for technician positions and failure to promote Black employees into official/manager positions were dismissed on May 16, 2005, and July 7, 2005, respectively, although the EEOC continues to pursue individual disparate treatment claims alleging failure to promote Black employees into official/manager positions.

## II. Jurisdiction

The court has jurisdiction to adjudicate federal claims under 28 U.S.C. § 1331.

## III. Standard for Summary Judgment

The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine issue of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986). The moving party can meet this burden by pointing out to the court that the respondents, having had sufficient opportunity for discovery,

have no evidence to support an essential element of their case. See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. A genuine issue for trial exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party opposing the motion must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Instead, the nonmoving party must present "concrete evidence supporting its claims." Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989). The district court does not have the duty to search the record for such evidence. See InterRoyal Corp. v. Sponseller, 889 F.2d 108, 110-11 (6th Cir. 1989). Nonmovants have the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in their favor. See id.

## IV. Analysis

### A. Counts I-III

The EEOC advances three theories of liability to support the first three counts in its complaint: 1) pattern or practice disparate treatment; 2) pattern or practice disparate impact; and 3) individual disparate treatment.

A claim for disparate treatment arises when an employer or prospective employer "treats some people less favorably than others because of their race, sex, religion, or national origin." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977). Where a systemwide pattern or practice of disparate treatment is alleged, the plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It ha[s] to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure..." Id. at 336.

The plaintiff in a pattern or practice case has the initial burden of showing "that unlawful discrimination has been a regular procedure or policy followed by an employer." Id. at 360. The employer must then show "that the [plaintiff]'s proof is either inaccurate or insignificant." Id. "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." Id. at 335 n.15.

4

Disparate impact claims do not require a plaintiff to show that the employer had a discriminatory motive. <u>Wards Cove Packing Co. v. Atonio</u>, 490 U.S. 642, 646 (1989). A plaintiff claiming that an employment practice has a disparate impact must show that the practice "caused a significant adverse effect on a protected group." <u>United States v. City of Warren, Mich.</u>, 138 F.3d 1083, 1091 (6th Cir. 1998). Once the plaintiff has proven there is a significant adverse effect, the employer must show "that the challenged practice is a business necessity." <u>Id.</u> at 1091-92.

A plaintiff alleging individual disparate treatment, where there is no direct evidence of discriminatory motive, has the initial burden of establishing a prima facie case of discrimination under the <u>McDonnell Douglas</u> framework. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). When a plaintiff produces evidence to establish a prima facie case, the burden shifts to the employer to put forth a legitimate, nondiscriminatory reason for its action. <u>Id.</u> Once an employer has offered such a reason, the plaintiff must show that this reason is merely a pretext. <u>Id.</u> at 805.

A plaintiff, who seeks to establish a prima facie case of discrimination in hiring, must show that: (1) he is a member of a protected class; (2) he applied and was qualified for the position; (3) he was rejected; and (4) after he was rejected, the position remained open and the employer continued to seek

applicants with the plaintiff's qualifications. Id. at 802.  To establish a prima facie case for failure to promote using circumstantial evidence, the first three elements are the same. Nguyen v. City of Cleveland, 229 F.3d 559, 562-63 (6th Cir. 2000). As the fourth element, a plaintiff must show that "other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied." Id. at 563.

### 1. Pattern or Practice Claims

Under its pattern or practice theories, the EEOC specifically alleges that Autozone failed to hire blacks for low-salary management positions between 1993 and 2002, failed to hire females for medium-salary management positions between 1998 and 2002, failed to hire females for guard positions between 1993 and 1997, and failed to promote females to manager positions between 1998 and 2002. (Pl.'s Mem. 9.) These allegations are based on the EEOC's statistical evidence and, therefore, are more specific than the general allegations in the EEOC's complaint. In addition to statistical evidence, the EEOC presents anecdotal evidence of Autozone's practice of advertising job openings and promotion opportunities by word of mouth, a practice which the EEOC contends had an adverse impact on blacks and females because the majority of those responsible for hiring and promotion decisions were white males.

### a. Statistical Evidence

In its motion for summary judgment, Autozone makes a number of arguments questioning the reliability of the analyses conducted by the EEOC's expert, Dr. Burt Barnow ("Dr. Barnow"). It also asserts that Dr. Barnow's results do not support the EEOC's allegations.

*1) General Reliability*

Autozone has two primary criticisms of Dr. Barnow's analyses as a whole: (1) that he did not employ a Bonferroni Adjustment to account for multiple testing; and (2) that he used an arbitrary significance level that does not conform to the requirements of Castaneda v. Partida, 430 U.S. 482 (1997).

There is no basis for Autozone's claim that the use of a significance level of 2.5%[1] rather than 2.3% as in Castaneda is arbitrary or unacceptable. The Supreme Court in Castaneda stated, "As a general rule..., if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that [the result] was random would be suspect to a social scientist." 430 U.S. at 496 n.17. Two standard deviations is often approximated at 5% for two-tailed tests.[2] See Hazelwood School Dist. v. United States, 433 U.S. 299, 318 n.5 (1977) (Stevens, J., dissenting); Daniel L.

---

[1] Dr. Barnow established a significance level of 5% for two-tailed tests, with half of the probability (2.5%) in each tail of the test, and 2.5% for one-tailed tests.

[2] Castaneda dealt with a one-tailed test.

7

Rubinfeld, <u>Reference Guide on Multiple Regression</u>, <u>in</u> Reference Manual on Scientific Evidence 179, 213–14 (Fed. Judicial Ctr. 2000). In a footnote in <u>Hazelwood</u>, the Court stated, "These observations are not intended to suggest that precise calculations of statistical significance are necessary in employing statistical proof," 433 U.S. at 311 n.17, indicating that an approximation of two standard deviations at 5% is acceptable.

That Dr. Barnow did not use any method of statistical adjustment to account for multiple testing is, however, more troubling. "Repeated testing complicates the interpretation of significance levels. If enough comparisons are made, random error almost guarantees that some will yield 'significant' findings, even when there is no real effect." David H. Kaye & David A. Freedman, <u>Reference Guide on Statistics</u>, <u>in</u> Reference Manual on Scientific Evidence 83, 127 (Fed. Judicial Ctr. 2000). Certain statistical methods can be used in some cases to determine whether the findings are significant, but in other cases there is no solution capable of overcoming the flaws caused by multiple testing. <u>Id.</u> at 128.

The EEOC argues that statistical adjustments are not used in the field of labor economics or in employment discrimination actions and that Autozone's expert has admitted that he is not aware of other employment discrimination actions where the method was used or whether the method is generally used in the field of labor economics. (Levine Dep. 46:4–9, 55:6–18, May 26, 2005.)  In

8

a motion for summary judgment, "weighing the credibility of the competing expert reports amounts to improper fact-finding." Phillips v. Cohen, 400 F.3d 388, 399 (6th Cir. 2005). Given the contradictory views on the use of statistical adjustments, particularly the Bonferroni adjustment, the court does not have a sufficient basis to find that statistical adjustment was required in this case or that the non-utilization of any statistical adjustment makes Dr. Barnow's results unreliable. Therefore, the court will not grant summary judgment on the EEOC's pattern or practice claims on this basis.

In addition to its other general criticisms of Dr. Barnow, Autozone argues that Dr. Barnow's analyses should be disregarded because, in other cases where he presented evidence as an expert, courts have criticized or disregarded Dr. Barnow's opinions. The court will not, however, disregard Dr. Barnow's testimony solely on the basis of other courts' opinions of his past testimony, although those opinions, particularly where they reveal similar deficiencies in Dr. Barnow's proposed testimony in the present case, will be taken into consideration. See Prohaska v. Sofamor, S.N.C., 138 F. Supp. 2d 422 (W.D.N.Y. 2001) (excluding testimony from an expert whose testimony had been excluded for similar reasons in previous cases); Cooper v. Smith & Nephew, Inc., No. Civ. JFM 97-2578, 2000 WL 1728024 (D. Maryland. Nov. 20, 2000) (same).

2) _Hiring Analyses for Official/Manager Positions_

In conducting his hiring analyses of blacks and females to official/manager positions, Dr. Barnow conducted tests using three different time periods: 1993-2002, 1993-1997, and 1998-2002; and four different income levels: less than $35,000, $35,000-74,999, $75,000 or more, and all income levels. Thus, Dr. Barnow conducted twelve tests on the hiring of black managers and twelve tests on the hiring of female managers. In two of these twenty-four tests, Dr. Barnow found statistically significant underrepresentation: the analysis of the hiring of blacks for managerial positions with incomes less than $35,000 between 1993 and 2002 and the analysis of the hiring of females for managerial positions with incomes of $35,000 to $74,999 between 1998 and 2002. (Def.'s Mot. Ex. 3 at 1, 27-28.)

Autozone asserts that the statistically significant results in two out of twenty-four tests, or one out of twelve tests if the analyses for blacks and females were examined separately, should be regarded as a false positive. Given that the court must examine all evidence in the light most favorable to the EEOC for the purpose of summary judgment, however, the court will not exclude Dr. Barnow's results based on the opinions of Autozone and its expert.

Autozone, however, raises another concern about the results of the managerial hiring analyses for females. According to Autozone, Dr. Barnow's results actually show that there is _no_

10

statistically significant shortfall in the hiring of women for medium-salary management positions between 1998 and 2002. The one-tail probability for this test is 0.029 (2.9%), which is not statistically significant under the standards established by Dr. Barnow. (Id. Ex. 3 at 28, Ex. 7 at 11.) According to Dr. Barnow, however, his results are based on the two-tail probabilities, not the one-tail probabilities. (Id. Ex. 3 at 12.) In this case, using the two-tail rather than the one-tail probabilities is appropriate because one must look for both under- and overrepresentation, rather than looking for underrepresentation only. Therefore, the lack of statistical significance when using the one-tail probability is not determinative.

*3) Hiring Analyses for Female Guards*

Dr. Barnow conducted three analyses of the shortfall in hiring female guards, using three time periods: 1993-2002, 1993-1997, and 1998-2002. (Id. Ex. 3 at 29.) According to Dr. Barnow's results, there was a statistically significant shortfall of females hired as guards during the period from 1993 to 1997. (Id.) In addition to arguments similar to those about multiple testing discussed above in the context of hiring blacks and females for manager positions, Autozone asserts that the analyses of hiring female guards are unreliable because Dr. Barnow used census proxy data, rather than information from actual applications, in performing his analyses.

Although there is a general presumption in favor of using

the actual applicant data, there are exceptions to that
presumption, such as where the applicant data is unreliable.
David C. Baldus & James W. L. Cole, Statistical Proof of
Discrimination §§ 4.1.1, 4.12 (1980). In this case, the EEOC
asserts that Dr. Barnow did not use the actual applicant data
because Autozone did not make available all of the applications
for guard positions between 1993 and 2002. According to the EEOC,
Autozone provided only one hundred thirty-seven applications for
guard positions for the entire time period, one hundred twenty-
seven of which were from 1994 or 1995. (Def.'s Mot. Ex. 7 at
48-51.) Therefore, for the purposes of summary judgment, the
court finds it was reasonable for Dr. Barnow to use census proxy
data rather than the actual applicant data because of concerns
that the applicant data was incomplete.

*4) Promotion Analysis*

Dr. Barnow conducted ten tests in analyzing the frequency of
women promoted into official/manager positions. The tests studied
two time periods: 1993-1997 and 1998-2002; and five management
levels: "senior and executive vice presidents"; "vice
presidents"; "directors"; "managers"; and "other
manager/officials n.e.c." (Id. Ex. 3 at 30-31.) Dr. Barnow found
that women were underpromoted in the managers classification
between 1998 and 2002 and that the result was statistically
significant. (Id. Ex. 3 at 31.)

Autozone asserts, however, that Dr. Barnow's tests for the

time period from 1998 to 2002 are fatally flawed because, in conducting his analysis of the latter time period, he did not factor in employee tenure. (Barnow Dep. 110:7-9, May 25, 2005.) Tenure was, however, taken into consideration for the period from 1993 to 1997. According to Dr. Barnow, tenure was not factored into the analysis because there were too many negative values for tenure. (Id. at 110:10-17.) Autozone contends that the only way Dr. Barnow could have found individuals had negative tenure would have been if they had not yet been hired when a particular promotion was awarded. Dr. Barnow has admitted that such individuals were included in the promotion feeder groups. (Id. at 136:24-137:3.) Therefore, Autozone argues that Dr. Barnow's results were fatally flawed because the feeder group included a number of individuals who were not eligible for promotion.

Dr. Barnow's report indicates that other qualifications, including performance ratings, education, awards received, disciplinary actions, and training received, were not factored into his promotion analyses for either time period because the information was not available. (Def.'s Mot. Ex. 3 at 18.) Therefore, the only variables considered in Dr. Barnow's analyses, in addition to tenure in the earlier time period, were the year of observation, the individual's salary and job category at the beginning of the period, and whether the individual worked at corporate headquarters during the period at issue. (Id.)

The EEOC argues that it is not necessary to "prove discrimination with scientific certainty." Bazemore v. Friday,

478 U.S. 385, 400 (1986). The Sixth Circuit has held that statistical evidence does not need to account for candidates' qualifications to be relevant in promotion cases. Phillips, 400 F.3d at 400; Scales v. J.C. Bradford & Co., 925 F.2d 901, 908 (6th Cir. 1991). The inclusion of individuals who did not work at Autozone when a promotion was awarded in the feeder group for that promotion, however, is a more serious flaw than merely failing to account for all of the factors that an employer might consider in awarding the promotion, particularly given that the high occurrence of negative tenure indicates that this problem is not restricted to a few individuals in the feeder group.

Although it is not proper for the court to weigh the credibility of expert evidence at summary judgment, the flaws in Dr. Barnow's promotion analyses do not merely raise questions of credibility, but of accuracy and relevance. "There may, of course, be some regressions so incomplete as to be inadmissible as irrelevant...." Bazemore, 478 U.S. at 400 n.10. There may also be some regressions so flawed and methodologically unreliable as to be irrelevant. Given the flaws in Dr. Barnow's promotion regression analyses, the court cannot consider them relevant evidence of the EEOC's claims.

Therefore, the only relevant evidence supporting the EEOC's pattern or practice theories under Count III is anecdotal.[3]

_____

[3] Although Count III alleges claims for failure to promote both female and Black employees to official/manager positions, the claim for failure to promote Black employees is based solely on the theory of individual disparate treatment. Therefore, the pattern or practice theories relate only to the

14

"While anecdotal evidence may suffice to prove *individual* claims of discrimination, rarely, if ever, can such evidence show a *systemic pattern* of discrimination." <u>Middleton v. City of Flint, Mich.</u>, 92 F.3d 396, 405 (6th Cir. 1996) (quoting <u>O'Donnell Constr. Co. v. Dist. of Columbia</u>, 963 F.2d 420, 427 (D.C. Cir. 1992)). In its response to Autozone's motion, the EEOC cites deposition testimony from several claimants as well as some non-claimants, primarily white males who received promotions, discussing Autozone's promotion policies and the use of word of mouth to advertise open positions.  These depositions, however, are *at most* evidence of incidents in which individual white males were given an advantage over other applicants or potential applicants for a promotion and of a sentiment among some women at Autozone that white males received better treatment. They do not show an intent to discriminate on the part of Autozone and are not sufficient to make out a prima facie case of pattern or practice disparate treatment or pattern or practice disparate impact under Count III. Therefore, Autozone's motion for summary judgment is granted on the EEOC's pattern or practice claims in Count III.

### b. Disparate Impact

The practices that allegedly had a significant adverse effect on blacks and women in hiring—the use of informal hiring procedures, such as word of mouth advertising, favoritism, and

---

claim for failure to promote female employees.

subjective decision-making, coupled with the predominance of white males as decision-makers in the hiring process—do not relate to any objective criteria for employment at Autozone. Although subjective hiring practices may give rise to a disparate impact claim, "the plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force." <u>Watson v. Fort Worth Bank & Trust</u>, 487 U.S. 977, 994 (1988). The EEOC must also show causation. "[T]hat is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." <u>Id.</u>

The statistical evidence compiled by Dr. Barnow is insufficient to establish a prima facie case of disparate impact discrimination. As the Supreme Court has stated,

> It is completely unrealistic to assume that unlawful discrimination is the sole cause of people failing to gravitate to jobs and employers in accord with the laws of chance. It would be equally unrealistic to suppose that employers can eliminate, or discover and explain, the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.

<u>Id.</u> at 992 (internal citation omitted). The statistics presented by the EEOC show that out of twenty-seven regression analyses of the hiring of managers and guards conducted by Dr. Barnow, he found a statistically significant shortfall of blacks or females

hired in only three. In all three of those analyses, the probability was at or near the cusp of statistical significance.[4] Five of Dr. Barnow's tests indicated that the number of blacks or females hired to manager positions would be approximately equivalent to what would be expected,[5] and three tests indicated that the number of females hired as managers or guards exceeded what would be expected. (Def.'s Mot. Ex. 3 at 28-29.)

The EEOC argues that Autozone cannot move for summary judgment based on a "balancing test," meaning that the overrepresentation of blacks or females in certain time periods or job categories does not negate the evidence of underrepresentation in other periods or job categories. In support of this contention, the EEOC cites the Supreme Court's decision in Connecticut v. Teal, 457 U.S. 440 (1982). In Teal, however, the Court was addressing the effects of an objective test that was not job-related. Id. at 452. As the Court recognized several years later in Watson, however, it is generally not practicable to validate subjective hiring practices in the same manner as an objective test. 487 U.S. at 991.

---

[4] The two-tail probability in the analysis of the shortfall of blacks hired to low-salary management positions between 1993 and 2002 was .04, of females hired to mid-salary management positions between 1998 and 2002 was .05, and of females hired as guards between 1993 and 1997 was .048, with .05 or lower considered statistically significant. (Def.'s Mot. Ex. 3 at 27-29.)

[5] That is, in five of the tests, four analyzing the shortfall in hiring black managers and one analyzing the shortfall in hiring female managers, the two-tail probability was 1.000. (Id. Ex. 3 at 27-28.)

The use of word of mouth advertising and subjective considerations in hiring is hardly uncommon, and employers should not be expected to establish quota systems to ensure that there are never any shortfalls in hiring women and minorities.  The statistical evidence presented by the EEOC shows that Autozone did not always meet statistical expectations, but it is not sufficient to show that the employment practices at issue caused the exclusion of applicants because they were black or female. Therefore, Autozone's motion for summary judgment on the EEOC's claims for pattern or practice disparate impact in Counts I and II is granted.

### c. Disparate Treatment

The evidence presented by the EEOC also fails to establish a prima facie case of pattern or practice disparate treatment as to Counts I and II because it is insufficient to permit the inference of a discriminatory motive on the part of Autozone. The EEOC cannot establish that racial discrimination was Autozone's standard operating procedure using statistics that indicate that Autozone was more likely to meet or exceed statistical expectations about the number of blacks or females hired as managers or guards than it was to fall short of those expectations.

The anecdotal evidence presented by the EEOC does not indicate either directly or inferentially any intent to

discriminate on the part of Autozone. To support its claims of
discrimination in hiring, the EEOC cites the depositions of four
white males who learned of job openings at Autozone by word of
mouth. (Pl.'s Mem. 13-14.) The EEOC fails to mention, however,
that two of those men learned of the job openings from female
managers at Autozone. (Loftiss Dep. 17:9-18:6, July 25, 2002;
Poynter Dep. 27:1-24, Aug. 28, 2002.) That a small number of
white men were hired for jobs at Autozone after hearing of
openings by word of mouth does not suffice to establish that
Autozone intentionally discriminated against blacks and females
in hiring. Therefore, Autozone's motion for summary judgment on
the EEOC's claims for pattern or practice disparate treatment in
Counts I and II is granted.

### 2. Individual Claims

When Autozone filed its motion for summary judgment, there
were one hundred forty-eight individual claimants.[6] (Def.'s Mem.
3.) Autozone seeks summary judgment on each of these individual
claims. In its response, the EEOC "presents specific responses
for only a representative sample of its individual claimants."
(Pl.'s Mem. 8.) Because the EEOC has not responded to Autozone's
motion for summary judgment as to each of its individual
claimants and because of the court's ruling granting summary

---

[6] Apparently, at least one claimant, Monique Spikes, has been dropped
since Autozone filed its motion. (Def.'s Reply Ex. 1.) The court has received
no additional information about the status of the individual claims.

judgment in favor of Autozone on the EEOC's pattern or practice claims, the court cannot render summary judgment on the individual claims at this time. Therefore, Autozone's motion for summary judgment on the EEOC's claims for individual disparate treatment in Counts I, II, and III is denied without prejudice.

**B. Count IV-Record Keeping Violation**

Section 709(c) of Title VII requires employers (1) to maintain records relevant to the determination of whether unlawful employment practices have been or are being committed, (2) to preserve those records for a period of time, and (3) to make reports from the records as the EEOC prescribes. 42 U.S.C. § 2000e-8(c). The EEOC specifically alleges that Autozone violated the requirements of 29 C.F.R. § 1607.4(A), enacted in accordance with the provisions of § 709(c). That regulation requires that employers maintain and make available for inspection records that show the impact its hiring procedures have on members of specific races, sexes, and ethnic groups specified in § 1607.4(B).

Autozone asserts that the EEOC has produced no evidence to support its record keeping allegations. The court finds, however, that the EEOC has produced evidence showing a genuine issue of material fact about whether Autozone kept records as required by 29 C.F.R. § 1607.4(A). Shirley Branum, an employee and later a recruiter in personnel services for Autozone from 1994 to 2002, stated in her deposition that personnel services did not keep

records on the race and sex of people who were interviewed. (Branum Dep. 9:13-10:25, 50:13-16, Sept. 19, 2002.) The hiring personnel at Autozone also did not make any reports about or track the diversity of the applicant pool according to Branum. (Id. at 51:6-24.)

Because Branum's testimony shows that there is a genuine issue of material fact about whether Autozone maintained records showing the impact of its hiring procedures on specified sexes, races, and ethnic groups, Defendant's motion for summary judgment on Count IV of the complaint is denied.

## V. Conclusion

Defendant Autozone, Inc.'s motion for summary judgment is GRANTED on Plaintiff Equal Employment Opportunity Commission's claims for pattern or practice disparate treatment and pattern or practice disparate impact in Counts I, II, and III of the complaint.

Defendant Autozone, Inc.'s motion for summary judgment is DENIED without prejudice on Plaintiff Equal Employment Opportunity Commission's claims for individual disparate treatment in Counts I, II, and III of the complaint.

Defendant Autozone, Inc.'s motion for summary judgment is DENIED on Count IV of the complaint.

So ordered this 29th day of August 2006.

s/Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE