## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff | ) ) | |
| v. | ) ) | No. 00-2923 |
| AUTOZONE, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII") against AutoZone, Inc. ("AutoZone").  The complaint, filed on September 29, 2000, alleges, inter alia, that Defendant AutoZone "failed to hire female applicants for official/manager, technician and service worker positions because of their sex..." (Compl. at 1.)  Since the lawsuit's inception, many claimants have been summarily denied relief.  (See generally Order Granting in Part and Denying in Part Def.'s Mot. for Summ. J., Aug. 13, 2007.)  Two claimants remain: Annette Thomas-Dickens and Shelly Sheets, both of whom unsuccessfully applied for security guard positions at AutoZone in late 1994 and early 1995.

From August 18, 2008, to August 20, 2008, the Court held a bench trial on the EEOC's two remaining claims against AutoZone. On November 3, 2008, the parties filed their proposed findings of fact and conclusions of law.  The parties responded to each other's proposed findings of fact and conclusions of law on December 4, 2008.  The judicial findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52 follow.

## I.   BACKGROUND

In the Pre-trial order the parties agreed to the following summary of the case:

> The Commission alleges that Defendant discriminated against Shelly Sheets and Annette Thomas-Dickens on the basis of sex, female. Ms. Sheets and Ms. Thomas-Dickens applied for security guard positions at Defendant AutoZone's corporate headquarters in late 1994. Ms. Sheets applied on or around November 8, 1994 and Ms. Thomas-Dickens applied on or around December 28, 1994. During that time period, AutoZone was seeking applicants for security guard positions at its store support center. In November of that year, Defendant placed one or more ads in the newspaper seeking security guards. Two recruiters, Shirley Branum and William Poynter, reviewed all applications for the security guard positions. They made the initial decision of who would be called in for an interview. The Commission filed this lawsuit under Title VII of the Civil Rights Act, as amended. The Commission alleges that Defendant discriminated against Ms. Sheets and Ms. Dickens, because of their sex, when it failed to hire them. The Defendant denies the allegations.

(Pre-trial Order Aug. 15, 2008, at 2.)

## II.  JURISDICTION

The Court has jurisdiction to adjudicate federal claims under 28 U.S.C. § 1331.

## III. FINDINGS OF FACTS

### A. STIPULATED FACTS[1]

1. Defendant placed an ad for security guards in the Commercial Appeal newspaper in November 1994.

2. Shelly Sheets applied for a security guard position in November 1994.

3. Annette Thomas-Dickens applied for a part-time security guard job at AutoZone on December 28, 2004.

4. Defendant had no written job description for security guard during the period of November 1994 to July 1995.

5. Shirley Branum and William Pointer [sic] were the individuals who selected all applicants for the initial interview to be hired as a security guard.

6. Shelly Sheets and Annette Thomas-Dickens are not seeking compensatory damages.

### B. FACTS ESTABLISHED AT TRIAL

The Plaintiff is an agency of the United States Government charged with the duty of enforcing Title VII.  The Plaintiff brought this action on behalf of Sheets and Thomas-Dickens, claiming that they were discriminated against on the basis of their sex, female, when AutoZone failed to hire them for security guard positions in Memphis, Tennessee, in late 1994 and

---

[1] Stipulated facts from the Joint Proposed Pre-Trial Order dated August 15, 2008, at 5-6.

early 1995.  In late 1994, AutoZone was experiencing significant growth and was opening a new corporate headquarters on Front Street in Memphis.  (Tr. 526, 325.)  AutoZone was also renovating a facility on Madison Avenue in Memphis.  (Tr. 325.) AutoZone needed to hire security guards to work at the new locations.  (Id.)

William Poynter ("Poynter") and Shirley Branum ("Branum") were responsible for recruiting and hiring individuals to fill the security guard positions.  (Tr. 419-420.)  AutoZone hired Poynter in 1990, and he began working as a recruiter for AutoZone stores about six months later.  (Tr. 318.)  Around September 1994, he was moved to the corporate office in Memphis and began recruiting for the store support center.  (Tr. 320.) Poynter has a bachelor's degree in management from the University of Mississippi and an MBA from Embry-Riddle Aeronautical.  (Tr. 316.)

Branum is a long-time employee of AutoZone who started at a predecessor of Malone and Hyde, which started AutoZone, in 1973 or 1974.  (Tr. 417.)  Branum became a recruiter in October 1994. (Id.)  Branum and Poynter both attended a two to three day interview skills workshop in late 1994 that included instruction on AutoZone's equal employment policy, how to take notes, and what types of questions to ask to get information about an interviewee's background.  (Tr. 319, 527-28.)

As part of the process of recruiting security guards, Branum and Poynter met with Andy Willis, the director of security and the hiring manager for security positions, to discuss the qualifications and criteria for applicants. (Tr. 321.) Willis assumed the position of director of security in November 1994. (Tr. 321.) Willis had a background in corporate security, the military, and law enforcement. (Tr. 322.) Branum and Poynter testified that, based on their meeting with Willis, they were seeking candidates with the following qualifications: availability, private security experience, military experience, EMT training, prior AutoZone experience, referrals from AutoZoners, steady work history, flexibility, and good communication skills. (Tr. 249, 421-22.) AutoZone never recorded or wrote down these criteria. (Tr. 248.)

Branum and Poynter looked through applications and resumes on file to determine whether any individuals who had previously applied were qualified for security guard positions. (Tr. 419.) If there were not enough applicants, they ran advertisements. (Id.) Poynter and Branum ran an ad for security guard positions in the November 21, 1994 Commercial Appeal, a newspaper in Memphis, Tennessee, seeking people who have "excellent telecommunication skills and are available for flexible schedules to include days, nights, and weekends" and who could pass a background check and drug test. (Exh. 15; Tr. 242.)

Branum testified that a security guard's primary duties were to work at the front desk, greet and announce visitors, and protect and patrol the premises, including the parking lot.  (Tr. 436.) Over the next ninety days AutoZone received an estimated 150 applications or resumes for security guard positions.  (Tr. 638.)   When AutoZone received an application, it was stamped "Received" and was then considered current for 90 days from the date on the stamp.  (Tr. 367.)  Poynter and Branum reviewed every application and resume submitted for each job.   (Tr. 240.)

     Poynter and Branum would screen the applications as they came in, sort the applicants by skill sets for the various positions Poynter and Branum were responsible for filling, select those applicants who best met the qualifications for each position, and contact those selected to come in for an interview.  (Tr. 244-45, 419-20.)   Poynter tried to match applicants' information on resumes or applications to the criteria for a job given to him by the hiring manager.  (Tr. 239-40.)  If the information contained in the resume showed that the applicant would be a good fit, he or she was contacted to come in and fill out an application.  (Tr. 244-245.)  Because Poynter continually received resumes to review, he called people as he saw that they appeared to meet the job qualifications. (Tr. 327-28.)  At times, Poynter could not reach an applicant to

have him or her come in for an interview.  (Tr. 327.)  If
Poynter were unsuccessful in getting an answer when he called an
applicant, he might set the application aside and try again.
(Tr. 328.)  Sometimes an applicant would not appear for the
interview or would turn down an offer to interview.  (Tr. 270-
71.)

Blank sections in an application would be a concern for
Poynter.  (Tr. 250.)  Steady work history was important.  (Tr.
422.)  A gap in employment would not, by itself, prevent a
candidate from being selected for an interview.  (Tr. 252.)  If
there was a gap in someone's employment history, Poynter would
question the applicant about it during the interview.  (Tr. 251-
52.)

Poynter understood that applicants might not know what
shifts were available at AutoZone when listing their
availability to work on an application or resume.  (Tr. 282.)
Without knowing what shifts AutoZone was trying to fill,
applicants would not know what to put on their applications or
resumes to make themselves attractive candidates.  (Tr. 282-83.)
Security guards worked in three eight-hour shifts.  (Tr. 262.)
The shifts were 7 a.m. to 3 p.m., 3 p.m. to 11 p.m., and 11 p.m.
to 7 a.m.  (Tr. 263.)  When contacting applicants, Poynter would
explain the shifts that were available, so that the applicants
could be more flexible in their availability.  (Tr. 345-46.)

7

During an interview, Poynter and Branum used an interview worksheet to keep a record of information about the candidate and his or her experience and to memorialize important facts they elicited during the interview. (Tr. 240, 419.) During an interview, Poynter would ask specific questions about the candidate's qualifications for the job and use the interview worksheet to make notes so that Poynter could remember the discussion. (Tr. 241.) One section of the interview worksheet dealt with the candidate's integrity. (Tr. 329.) Poynter looked for candidates who had high standards, and were honest and dependable. (Tr. 329.) He asked about prior disciplinary action and whether there were any other issues that the applicant had not yet disclosed that might come out in reference checks. (Tr. 334-35.)

Poynter also used an interview log form to record points about candidates that were paramount in his mind and whether he was recommending them for hire. (Tr. 241.) Poynter testified that job references were important when considering a candidate for a job. (Tr. 259.) The purpose of job references was to ensure that candidates were reliable and dependable, had a good work ethic, and had the experience mentioned in their applications or resumes. (Tr. 259-60.) A reference could verify that an applicant actually had worked the job he or she claimed to have worked, had performed the duties and

responsibilities he or she claimed to have performed, and had no problems in his or her previous position that might be related to his or her ability to perform for AutoZone.  (Tr. 260.) Poynter attempted to contact previous employers, but did not always get a response.  (Tr. 336.)

Branum stated that referrals from current AutoZone employees were valuable because AutoZone employees knew the culture and whether the new person would be a good fit and be good at his or her job.  (Tr. 467.)  She acknowledged, however, that someone who had been employed for only a few weeks would not be very familiar with the AutoZone culture.  (Tr. 468.)

Although Poynter and Branum looked for the best qualified applicants, the mix of applicants was constantly changing as more and more applications were received.  (Tr. 328-29.)  It was rare that someone met all of the qualifications for a security guard position.  (Tr. 328.)  Poynter sought applicants with the best qualifications.  (Tr. 329.)  Poynter sought applicants for the security guard positions who had job skills or prior experiences that were transferable to the security guard positions at AutoZone. (Tr. 256-57.)

Poynter thought that a person with military experience who had performed well in the military and who had protected the country would be qualified to protect a building and its premises.  (Tr. 254-55.)  Someone in the service would have

performed security duty.  (Tr. 279.)  Security watches and patrols in the military were relevant security experience.  (Tr. 272.)  Even without private security experience, a person with military experience could be looked upon favorably.  (Tr. 323-24.)  Military experience, however, was not a pre-requisite. (Tr. 254.)

Security experience, training related to security, including training acquired from a law enforcement agency or academy, and educational classes related to security were factors to which Poynter gave weight when considering applicants.  (Tr. 258.)  Having a background and training in dealing with criminals would be relevant experience or training for an AutoZone security guard.  (Tr. 259.)  Both Poynter and Branum believed, however, that corporate security guard experience was different from correctional officer experience and jailer experience.  (Tr. 266; 431.)  Correctional officer experience or jailer experience was not the type of experience they were seeking.  (Tr. 366-367.)  Branum testified that correctional officer and jailer experience did not compare to corporate security experience because jailers guard criminals and prisoners.  (Tr. 539.)  A jailer or correctional officer was responsible for guarding prisons and making sure that prisoners were confined and did not break rules.  (Tr. 539.)   Whereas, a security guard would deal with the public and employees in a

10

corporate setting.  (Tr. 266.)  Skills acquired as correctional officers or jailers were not absolutely discounted, but they were not as relevant as military or private corporate security guard experience.  (Tr. 268, 344-345.)  Correctional officer or jailer skills would be viewed as relevant in combination with other experience.  (Tr. 345.)

### 1. The Claimants

Approximately twelve to thirteen men were hired as security guards during the period from December 5, 1994, to February 25, 1995.[2]  (Tr. 442-444.)  The claimants, Shelly Sheets and Annette Thomas-Dickens, were among the more than one-hundred unsuccessful applicants.  Because AutoZone did not interview Sheets or Thomas-Dickens, their qualifications, as far as AutoZone was aware, were limited to the information on their applications or resumes.

### a. Shelly Sheets

AutoZone received a resume from Sheets on November 30, 1994.  (Tr. 42, Exh 13.)  On her resume, Sheets listed the following employment: Senior Correctional Officer, Department of Justice, Federal Bureau of Prisons, FCI Memphis, Tennessee from December 1991 to December 1993; Distribution Mail Clerk/Acting Supervisor of Mails, United States Postal Service, Williamsport,

---

[2] Thirteen successful applicants are discussed in Part III.B.2; however, the evidence indicates that Paul McElfresh may have been hired as a supervisor, see Part III.B.2.e infra, and that Isaac Lisogorski was hired outside the relevant period, see Part III.B.2.l infra; Tr. 443.

Pennsylvania from October 1987 to December 1991; and Soldier E-5, Sergeant United States Army, Fort Campbell, Kentucky, Mannheim, Germany, and Fort Hunter, Liggett, California from November 1981 to May 1987. (Exh. 13.) Sheets sought to highlight things on her resume that would look good for security or police positions. (Tr. 71.) Sheets did not explain her Army security experience in detail because she assumed potential employers would understand what a soldier did. (Tr. 73.)

Sheets' resume described her work experience in the Army, the Postal Service, and the Bureau of Prisons. (Exh. 13.) The resume listed training and courses she had attended: law enforcement, riot control/disturbance training, self-defense, firearms training, recruiter training, CPR, basic medical and first aid training, and supervisory training. (Id.; Tr. at 58-59.) Her resume also listed awards and commendations she received for good conduct, good performance, and superior achievement. (Id.) Branum believed that AutoZone had better qualified candidates for the security guard positions than Sheets. (Tr. 568.)

### b. Annette Thomas-Dickens

Annette Thomas-Dickens filled out an application on December 28, 1994. (Exh. 14.) On the application she indicated that she had learned of the job from two AutoZone employees, Brenda Campbell and Daniel Turner. (Id.) She indicated that

she was available for part-time work "Mon – Sun" "after 3pm – no later than 4pm." (Id.)  Thomas-Dickens also indicated that she was not available from "6am – 2pm." (Id.)  For education, she listed "in service training for correction officers." (Id.)  Thomas-Dickens has never been in the military. (Id.)  She listed the following employment: deputy jailer at the Shelby County Sheriff's Department from April 1988 to present; janitorial at American Building Maintenance from February 1993 to December 1994; and bus driver for Memphis City Schools from November 1985 to December 1987. (Id.)

In the summary section, Thomas-Dickens indicated that she had "10 years of security (very alert and observative [sic]: willing to learn." (Id.)  Thomas-Dickens' ten years of security experience included security jobs at Murray Guard, Phelps Security, and St. Joseph's Hospital. (Tr. 135-37.)  She did not list each job separately on the application because she was not sure of her employment dates with those companies and did not want to falsify her application. (Tr. 144-45.)  She intended to explain the specifics of her security experience in an interview. (Id.)  Although Thomas-Dickens testified at trial that she had private security experience, that was not clear from her application.  Therefore, Branum and Poynter would not have been aware of Thomas-Dickens' security experience when they were reviewing applications and choosing which applicants to

call for an interview.[3]  According to Branum, Thomas-Dickens

"wouldn't have been very qualified for what [AutoZone was]

looking for." (Tr. 572.)  "If there were other people who had

more experience we were looking for they would have been called

before her." (Id.)  Branum considered the persons AutoZone

hired during the relevant period better qualified than Thomas-

Dickens. (Id.)

### 2. Successful Male Applicants

During the ninety-day period that Sheets' and Thomas-

Dickens' applications were active, AutoZone hired approximately

twelve to thirteen men to fill security guard positions.  The

qualifications of some of those men follow.

### a. Billy Jones

Billy Jones applied in person for a security guard position

with AutoZone on February 1, 1995. (Tr. 185.)  Jones had worked

for Murray Guard, a private security company, for three years.

(Exh. 5.)  Jones also had worked at Malone and Hyde, AutoZone's

former parent company. (Tr. 186-187.)  Jones' application

reflects no military service and no security-related education

or course work. (Exh. 5.)  He had no CPR or first aid training

when he applied for work at AutoZone. (Tr. 194.)  Jones stated

on his application that he had worked for a private investigator

---

[3] See Cline v. BWXT Y-12, LLC, 521 F.3d 507, 510 (6th Cir. 2008) (Employee had
"only himself to blame for failing to note" relevant qualification on this
resume, because "[e]mployers have no duty to determine whether an applicant
has more qualifications than his resume indicates.")

from September 1990 to December 1991, but, in fact, he had worked only on three to four occasions during that period. (Exh 5; Tr. 189-190.) He was otherwise unemployed during that time. (Tr. 190.) His application reflects no employment from 1981 to 1989. (Tr. 187; Exh. 5.)

### b. Royal Bowhay

Royal Bowhay filled out an application on December 2, 1994. (Exh. 1.) He indicated that he had 20 years of experience in the Navy that included shore patrol and hanger and flight line security. (Id.) His wife was an AutoZone employee, and he listed her as his emergency contact on the application. (Tr. 331; Exh. 1.) Bowhay sought full-time employment and indicated he had good availability for shifts. (Tr. 271.) He had been employed as an unarmed guard by Imperial Security from October 1994 to November 1994 and had worked for various firms as a system service technician from November 1985 to February 1993. (Exh. 1.) Bowhay was not employed from February 1993 to October 1994. (Exh 1; Tr. 272.)

### c. Darrell Harvey

Darrell Harvey applied for a security guard position at AutoZone on December 4, 1994. (Exh. 2.) Poynter recommended Harvey for hire because he had seven years of private security experience, Sheriff's Department training, two years of college in Criminal Justice, was outgoing, and had good communication

15

skills and good integrity.  (Tr. 341-42.)  Harvey did not have
prior AutoZone experience, military experience, or relatives
that worked for AutoZone.  (Exh. 2.)

### d. Eddie Hampton

Poynter interviewed Eddie Hampton for a security guard
position on December 14, 1994.  (Tr. 302; Exh. 16.)  Hampton had
seven years of experience in private security, special training
from the Sheriff's Department, and an associate degree in
criminal justice.  (Exh. 16; Tr. 303)  Hampton had limited
availability to work shifts at AutoZone.  (Tr. 303.)  He had
another full-time job and did not want to work every weekend for
AutoZone.  (Tr. 303.)

### e. Paul McElfresh

Paul McElfresh applied for a security guard position on
December 11, 1994.  (Tr. 311; Exh. 20.)  He had approximately
three years of private security experience, but had no military
experience, and had no related schooling or course work.  (Tr.
311; Exh. 20.)  He lists Andy Willis, the hiring manager, as a
reference.  (Tr. 311.)   He was apparently hired as a supervisor
at $10.00 per hour.  (Tr. 311.)

### f. James Spivey

Poynter interviewed James Spivey for a part-time security
guard position on December 12, 1994.  (Exh. 18.)  He had at
least six years of private security experience.  (Tr. 307-308;

Exh. 18.)  Spivey was recommended by Darrell Harvey.  (Tr. 307-308.)  Spivey was in the military, but his education and courses did not relate to a security guard position.  (Tr. 307.)  Spivey worked full-time at another job, so he had limited availability to work shifts for AutoZone.  (Tr. 306.)  Poynter hired Spivey for a security guard position.  (Tr. 308.)

### g. Mark Mullins

Mark Mullins applied for a security guard position at AutoZone on February 13, 1995.  (Exh. 8.)  Mullins had a total of 17 months of security experience from September 1993 to February 1995.  (Tr. 386.)  Mullins was recommended by J.W. Williamson who had been hired by the director of security, Andy Willis, and who had worked with Mullins in a security position at the Peabody hotel.  (Tr. 380.)  Mullins worked at Wackenhut, a contract security company, from September 1993 to February 1995.  (Tr. 370-78.)  Mullins was assigned to different companies to provide security, including the Days Inn and the Peabody Hotel.  (Tr. 378.)  Mullins had an eight-month gap in employment from January 1991 to August 1991.  (Tr. 385.)

### h. Frederick Jones

Frederick Jones submitted an application for setup crew. (Tr. 308; Exh. 19.)  Poynter interviewed Frederick Jones on November 29, 1994, for a setup crew or security guard position. (Tr. 308.)  Jones had two months of experience as a private

security guard guarding a cemetery.  (Tr. 309-10.)  He was
referred by AutoZone employee Marcus Hamilton.  (Exh. 19.)  He
had good communication skills and a degree in Police
Administration.   (Id.)  Jones' application showed no other
relevant job experience.  (Tr. 310.)  He had no military
experience.  (Exh. 19.)  Poynter recommended Jones for hire
because he had a degree in police administration, was focused on
what he wanted to do in the interview, and had good integrity,
good communication skills, and good availability for work.  (Tr.
361-362.)

### i. Gary Hicks

Gary Hicks applied for and was interviewed by Poynter on
January 31, 1995, for a part-time security guard position.
(Tr. 286; Exh. 4.)  Hicks had served 23 years in the Air Force
and had never been employed by AutoZone.   (Tr. 286-87.)
According to Hicks' application, he was unavailable to work any
weekday shifts.  (Tr. 286.)  He could not work every weekend.
(Tr. 288.)   Hicks did not identify any security-related
experience on his application.  (Id.)  Poynter hired Hicks. (Tr.
288.)

### j. Phillip Logan

Poynter interviewed Phillip Logan, who applied for a part-
time security guard position on January 27, 1995.  (Tr. 277;
Exh. 3.)  At the time of his application, Logan was a

corrections officer at Shelby County Corrections and had taken security courses at Tennessee Corrections Institute.  (Exh. 3; Tr. 279-280.)  He had served in the military for about four years.  (Tr. 279.)  According to his application, it appeared that Logan was unavailable to work any shift.  (Tr. 279.) During the interview, however, Poynter determined that Logan could work one of the shifts AutoZone had available.  (Tr. 282.) Logan had never worked for AutoZone.  (Exh. 3.)

Poynter considered that Logan's 40 hours of training at Tennessee Corrections Institute in tactics control, fire safety, and writing reports was relevant and noted it on the interview worksheet.  (Tr. 281.)  Poynter contacted two of Logan's references, one of whom was a deputy jailer.  (Tr. 283.) Poynter considered it significant that Logan was a team player, dependable, and honest.  (Id.)  Poynter may have credited Logan's four years of experience as a corrections officer as four years of security experience.  (Tr. 284.)  He hired Logan as a security guard.  (Tr. 283.)

### k. Sterling Stone

Stone applied for a security position on February 1, 1995. (Exh. 12.)  He was available to work the 11 p.m. to 7 a.m. shift any day, but could not work Monday through Friday 2 p.m. to 10 p.m.  (Id.)  He did not have military experience or private security experience.  (Tr. 452-53; Tr. Exh. 12.)  He had five

years of correctional experience and had minored in Criminal
Justice at Middle Tennessee State University.  (Exh. 12.)  Stone
did not have private security experience, but he did have a
formal academic education in criminal justice.  (Exh. 12.)

### l. Isaac Lisogorski

Poynter interviewed Isaac Lisogorski, who applied for a
full-time Security Guard position on March 31, 1995.  (Tr. 298-
99; Exh. 10.)  Lisogorski did not have private security
experience, but did report that he had had security
responsibilities at previous jobs.  (Tr. 299-301.)  Lisogorski
had served in the Army from 1966 to 1969, as a Green Beret, as a
radio relay operator, and doing radio maintenance.  (Exh. 10;
Tr. 299-301.)  Lisogorski had good availability for shift work.
(Tr. 298.)  He had never worked for AutoZone before and had no
schooling or course work relevant to a security guard position.
(Tr. 298-99.)  There is a gap in Lisogorski's employment from
December 1994 to March 31, 1995.  (Tr. 299-300.)  Poynter did
not check Lisogorski's references, but hired him as a full-time
security guard.  (Tr. 301; Exh. 10.)

### m. Thomas McCarty

Thomas McCarty was referred by John Williamson.  (Exh. 26.)
McCarty's application lists his hours of availability as
"Weekdays 5 p.m., weekends 24 hours."  (Tr. 464.)  He was a
health science student until 1990 and his experience was in the

medical field.  (Exh. 26; Tr. 466.)  He had no security

experience.  (Tr. 266.)  Branum acknowledged that Williamson,

who had applied three weeks before McCarty, would not have been

familiar with the AutoZone culture.  (Tr. 468.)

McCarty did not have previous security experience.  Like

Stone, McCarty had a formal academic education.  His education

was in the medical field, not criminal justice.  He was also

referred by Williamson, who had been referred by Willis, the

director of security.  Although Williamson had recently been

employed by AutoZone, his relationship with Willis suggests an

understanding of how Willis runs security and his expectations

of employees.

### 3. Unsuccessful Male Applicants

During trial, AutoZone presented evidence about a selected

group of unsuccessful male applicants.  Based on the evidence,

it was unclear whether these men were called for interviews or

interviewed by AutoZone.  The evidence shows only that these men

applied for security guard positions at AutoZone and that

AutoZone did not hire them.

### a. Jessie H. Purvis

Jessie Purvis had completed 42 semester hours toward a

degree in criminal justice, had completed training in the Shelby

County Sherriff's Department reserve training program, had four

years of experience in the Army, and had ten years of private
security experience.  (Exh. 28.)

### b. Joe Causley

Joe Causley had over 16 years of private security
experience and long-term steady employment.  (Exh. 29.)

### c. Tony Crowder

Tony Crowder had almost three years of experience as a
deputy sheriff, two and a half years of experience as a
corrections officer, and long-term steady employment.  (Exh.
30.)

### d. Michael Anthony Donnell

Michael Donnell had nine years of private security
experience and was the director of security for Liberty Bowl
Stadium.  (Exh. 32.)

### e. Johnny Fayne

Johnny Fayne had ten years of private security experience.
(Exh. 34.)

### f. Robert Riley

Robert Riley had thirteen years of experience in the
sheriff's office, twenty-eight years of law enforcement
experience, and a referral from Brenda Campbell, the AutoZone
employee who also referred Thomas-Dickens.  (Exh. 35.)

### g. Kynan Hudson

Kynan Hudson had served for two years in the Army and had one year of private security experience. (Exh. 36.)

### h. Marcus Perry

Marcus Perry had four years of service in the Navy and over a year of private security experience. (Exh. 37.)

### i. Miles Williams

Miles Williams had two years of private security experience. (Exh. 38.)

### j. James Scott Bradshaw

James Bradshaw was a Ranger in the Army and had worked in private security as a manager for three months. (Exh. 41.)

### k. Billy Wayne Brooks

Billy Brooks had seven years of experience in the Sheriff's Department and was referred by Daniel Turner, the same AutoZone employee who referred Thomas-Dickens. (Exh. 31.) Brooks listed questionable availability for the shifts at AutoZone. (Id.)

### l. Kenneth E. Edwards

Kenneth Edwards had questionable availability, took several courses in security at State Technical Institute, had five years of experience in the Shelby County Sheriff's Department, had less than one year of experience as a patrolman at the State Technical Institute, and listed Danny Turner as a reference. (Exh. 33.)

### m. Felix Goodwin

23

Felix Goodwin had taken courses in Police Science at Shelby State Community College, had one year of experience in private security, and had three years of experience as a jailer with the Shelby County Sheriff's Department.  (Exh. 39.)

### n. Reginald Lynn Lemax

Reginald Lemax had five years of experience as a deputy jailer with the Shelby County Sheriff's Department. (Exh. 42.)

### o. Richard A. Elmore, Jr.

Richard Elmore had three and a half years of experience as a corrections officer at the Shelby County Correctional Center. (Exh. 43.)

### p. Ricky Cheeks

Ricky Cheeks had five years of experience as a correctional officer at the Shelby County Correctional Center and had recently joined the Army reserves.  (Exh. 44.)

### q. Vedarro K. Crutchfield

Vedarro Crutchfield had four years of experience in the Army and had worked as a military police officer.  (Exh. 45.) He also had two years of experience as a corrections officer. (Exh. 45.)

### r. John H. Williams

John Williams had seven years of experience in the Army and one year of experience as a corrections officer with the Shelby County Correctional Center.  (Exh. 46.)

### s. Ronald D. Nelson

Ronald Nelson majored in criminal justice at Shelby State Community College, had taken some courses in criminal justice at the University of Memphis, and had five years of experience as a corrections officer at the Shelby County Correctional Center. (Exh. 47.)

## IV. CONCLUSIONS OF LAW

The plaintiff has the initial burden of establishing a prima facie case of discrimination under Title VII. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The burden of establishing a prima facie case "is not onerous." Jackson v. FedEx Corp. Servs., Inc., 518 F.3d 388, 396 (6th Cir. 2008) (citing Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). If a plaintiff cannot establish discrimination through direct evidence, she can establish an inference of discrimination by showing that: (1) she is a member of a protected class, (2) she applied for and was not hired for a job, (3) she was qualified for the position, and (4) a similarly-situated person who was not in her protected class received the job. Seay v. Tennessee Valley Authority, 339 F.3d 454, 463 (6th Cir. 2003); Johnson v. Univ. of Cincinnati, 215 F.3d 561, 572-73 (6th Cir. 2000). When a plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to put forth a legitimate, non-

25

discriminatory reason for its action. See McDonnell Douglas, 411 U.S. at 802.

Once an employer has offered such a reason, the plaintiff must show that this reason is merely a pretext. Id. at 805. A plaintiff can establish pretext by showing that the defendant's proffered reason for its decision: (1) has no basis in fact; (2) did not actually motivate the defendant; or (3) was insufficient to warrant defendant's decision. Dews v. A.B. Dick Company, 231 F.3d 1016, 1021 (6th Cir. 2000). The ultimate burden of persuading the fact finder that the defendant intentionally discriminated against the plaintiff always remains with the plaintiff. Gragg v. Somerset Tech. College, 373 F.3d 763, 768 (6th Cir. 2004).

### A. Prima Facie Case

The EEOC has established a prima facie case of discrimination on behalf of Sheets and Thomas-Dickens. Both women are members of a protected class, they were qualified for a security guard position, they applied for and were not hired for that position, and similarly situated men were hired. To show that a female applicant is qualified, the EEOC need only produce "some credible evidence that she possesses the objective qualifications necessary to perform the job at issue." EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1194 (10th Cir. 2000). Sheets and Thomas-Dickens were, at least, minimally

qualified for security guard positions according to the qualifications listed in the advertisement and the job responsibilities Branum identified.  Defendant offers no challenge to Sheets' and Thomas-Dickens' skills or their ability to meet the qualifications stated in the advertisement.

Thomas-Dickens applied for a Security Guard position on December 28, 1994.  She wanted to work part-time after her full-time job ended.  Thomas-Dickens had over six years of experience as a deputy jailer with the Shelby County Sheriff's Department in Memphis.  She had received law enforcement training for correctional officers and performed duties that included dealing with the public.

Sheets applied for a security guard position on November 30, 1994, by submitting a resume in response to the advertisement in the Commercial Appeal.  Sheets was unemployed when she applied to AutoZone and could work either part-time or full-time.  Her resume reflects that from December 1991 to December 1993 she served as a senior corrections officer for the Federal Bureau of Prisons at the Federal Correctional Institute in Memphis.  She had three weeks of training at the Federal Law Enforcement Academy, and she had disturbance/riot control training, firearms training, and first aid training.  Sheets also served in a leadership position during part of her five and one half years of service in the Army and was honorably

discharged with the rank of Sergeant.  Neither Sheets nor Thomas-Dickens was hired for a security guard position.

Approximately twelve to thirteen men were hired for security guard positions while Sheets' and Thomas-Dickens' applications for the position were active, including Royal Bowhay, Darrell Harvey, Phillip Logan, Gary Hicks, Costello Hayslett, Billy Jones, Robert Flynn, Morris Priora, Thomas McCarty, Mark Mullins, and Sterling Stone.  A number of these men had qualifications similar to claimants'.

The EEOC has established a prima facie case of discrimination by showing that Sheets and Thomas-Dickens applied for security guard jobs, were qualified for the positions, were available to work the AutoZone shifts required, were not hired, and that similarly situated men were hired.

### B. Legitimate Non-Discriminatory Reason

Once Plaintiff has established a prima facie case, Defendant must come forward with a legitimate, non-discriminatory reason for its employment decision.  Such a reason causes the presumption of discrimination to drop away. AutoZone's legitimate, non-discriminatory reason for not hiring claimants is that the men it hired were better qualified than Sheets and Thomas-Dickens.  The burden on Defendant to produce a legitimate, non-discriminatory reason is "one of production, not persuasion; 'it can involve no credibility assessment.'"  Reeves

v. Sanderson Plumbing Products, Inc., 530 U.S. at 142 (citing
St. Mary's Honor Center v. Hicks, 509 U.S. 502, 509 (1993)).
AutoZone has met its burden of production.  AutoZone offered
evidence at trial that it considered other applicants better
qualified than Sheets or Thomas-Dickens.  (Tr. 568, 572.)

### C. Pretext

After the defendant has proffered a legitimate, non-
discriminatory reasons for its actions, the plaintiff must be
afforded the "opportunity to prove by a preponderance of the
evidence that the legitimate reasons offered by the defendant
were not its true reasons, but were a pretext for
discrimination."  Burdine, 450 U.S. at 253.  It is well
established that pretext can be established by showing that "the
proffered reason (1) has no basis in fact (2) did not actually
motivate the defendant's challenged conduct, or (3) was
insufficient to warrant the challenged conduct."  Dews, 231 F.3d
at 1021.

### 1. No Basis in Fact

The EEOC argues that AutoZone's legitimate, non-
discriminatory reason has no basis in fact because the
qualifications AutoZone says it sought were created after the
claims had arisen and were not, in fact, applied in 1994 and
1995.  AutoZone had no written job descriptions for the security
guard position during the relevant time period.  Therefore, the

EEOC maintains that there is no proof that the criteria Branum and Poynter testified that they used to select security guards existed in 1994 and 1995. The EEOC urges that the ad AutoZone used to solicit candidates states the actual qualifications for the security guard position because it matches the primary duties of security guards to which Branum testified.

The EEOC's theory requires the Court to disregard Branum's and Poynter's testimony about the qualifications they sought in candidates. The EEOC has the burden of proving pretext and offers no convincing reason why Branum's and Poynter's testimony should be disregarded. The witnesses were credible. They appeared to be telling the truth. Poynter, no longer an AutoZone employee, had no interest in the outcome of the case. Branum is still employed by AutoZone, but the EEOC presented no evidence that Branum's job security would be affected by her testimony. Both witnesses had good memories considering that the events to which they testified transpired over 14 years ago. The witnesses testified about matters with which they were directly involved. Their testimony was mutually consistent. AutoZone offered proof, Branum's and Poynter's credible testimony, that the criteria it used to select candidates for security guard positions were not limited to the criteria stated in the written advertisement.

AutoZone received applications from more than one-hundred candidates for security guard positions during the relevant time period.  Many applicants were qualified for the positions based on the minimal requirements in the advertisement in the Commercial Appeal.  It was reasonable, therefore, for AutoZone to employ additional criteria when screening applicants to narrow the pool to those most qualified for the position of security guard.  See Browning v. Dep't of Army, 436 F.3d 692, 696 (6th Cir. 2006) ("[E]mployers are not rigidly bound by the language in a job description.").  That a job description does not express an interest in candidates with certain qualifications does not prevent a company from including candidates with those qualifications in its mix of interviewees. Cline, 521 F.3d at 510.  The EEOC has not proven by a preponderance of the evidence that the qualifications AutoZone stated it sought in candidates for security guard positions were not actually used by AutoZone in 1994 and 1995.  Therefore, the EEOC has not carried its burden of establishing that AutoZone's proffered legitimate, non-discriminatory reason for not hiring Sheets and Thomas-Dickens has no basis in fact.

### 2. Actual Motivation

The EEOC also argues that the qualifications Branum and Poynter testified they used to select candidates did not actually motivate Defendant's decision not to hire Sheets and

31

Thomas-Dickens because application of the selection criteria could not explain why so many men were selected instead of Sheets and Thomas-Dickens.  "[T]he reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."  Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 576 (6th Cir. 2003). In Burdine, the Supreme Court explained that "[t]he fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." 450 U.S. at 259.

"[A]rguing about the accuracy of the employer's assessment is [merely] a distraction because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest." Clack v. Rock-Tenn Co., 2008 WL 5378026, at *6 (6th Cir. Dec. 22, 2008) (quoting Smith v. Chrysler Corp., 155 F.3d 799, 806 (6th Cir. 1998)).  "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason" for making a hiring decision, the plaintiff "cannot establish that the reason is pretextual simply because it is ultimately shown to be incorrect." Majewski v. Automatic Data Processing, Inc., 274

F.3d 1106, 1117 (6th Cir. 2001).  "An employer has an honest belief in its rationale 'when it reasonably relied on the particularized facts that were before it at the time the decision was made.'"  Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 599 (6th Cir. 2007) (quoting Majewski, 274 F.3d at 1117).  "The key inquiry is whether the employer made a 'reasonably informed and considered decision,' not whether the decisional process was optimal or 'left no stone unturned.'"  Vaughn v. Louisville Water Co., 2008 WL 4997487, at * 11 (6th Cir. Nov. 24, 2008) (citing Caterpillar Fin. Servs. Corp, 496 F.3d at 598-99).  "Of course, a purported error 'too obvious to be unintentional' may indicate pretext."  Clack, 2008 WL 5378026, at *6 (citing Fischbach v. District of Columbia Dept. of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

     Most of the men AutoZone hired had more of the qualifications Branum and Poynter testified that they sought than Sheets or Thomas-Dickens.  Specifically, many indicated on their resumes or applications that they had private security experience.[4]  The EEOC attempts to demonstrate that the men hired were not better qualified by doing a point-by-point comparison. Comparing individuals on each factor is not instructive in deciding whether, considering each application as a whole,

---

[4] The men AutoZone hired who had at least one year of private security experience were Billy Jones, Darrell Harvey, Eddie Hampton, Paul McElfresh, James Spivey, and Mark Mullins.

AutoZone could reasonably have concluded that the men it interviewed and hired were better qualified than Sheets or Thomas-Dickens.[5]  See Cline, 521 F.3d at 510 (finding no discrimination where several interviewees lacked "one or all of the qualifications the company said were fatal to [plaintiff's] application," because those applicants had other qualifications that plaintiff did not have).

The EEOC attempts to discredit AutoZone's claim that it did not value correctional officer or jailer experience as highly as prior private security experience as unreasonable.  The EEOC argues that, based on similarities between the two jobs, AutoZone could not have reasonably concluded that private security experience was preferable to correctional officer or jailer experience.  Although a plaintiff "may disagree with the company's decision to value some characteristics over others, he

_____

[5] Royal Bowhay appeared to be a more attractive candidate than Sheets or Thomas-Dickens because of his limited private security experience, his long-time service in the military, and his wife's employment at AutoZone. AutoZone could reasonably have concluded that Frederick Jones was a better fit for a security guard position than Thomas-Dickens or Sheets because he had security experience, a degree in police administration, and a referral by an AutoZone employee.  Like Thomas-Dickens, Jones was referred by an AutoZone employee. AutoZone apparently did not regard referrals by Daniel Turner very highly, because several applicants referred by Turner were not selected for an interview.  AutoZone also could have found that Jones' degree in police administration made him better qualified for the position.  Gary Hicks was one of the few males interviewed and hired with no private security experience.  It is reasonable that AutoZone found that his length of service in the Air Force distinguished him from applicants such as Sheets and Thomas-Dickens. Phillip Logan was very similar to Thomas-Dickens and Sheets, but he had 40 hours of training at the Tennessee Corrections Institute. Sterling Stone could also be distinguished from Sheets and Thomas-Dickens by his formal academic education, which provides a factual basis for AutoZone to have concluded that he was a better candidate than Sheets or Thomas-Dickens. Thomas McCarty's education and referral were grounds for AutoZone to have found him better qualified than Sheets or Thomas-Dickens.

'may not simply substitute his own business judgment for that of the defendant.'" Cline, 521 F.3d at 510 (citing Rowan v. Lockheed Martin Energy Sys., Inc., 360 F.3d 544, 550 (6th Cir. 2004)). "An employer's business judgment, however, is not an absolute defense to unlawful discrimination." EEOC v. Yenkin-Majestic Paint Corp., 112 F.3d 831, 835 (6th Cir. 1997) The key inquiry is not whether AutoZone was correct in its weighing of security experience against correctional officer experience, but whether it honestly believed that correctional officer experience was not as relevant as previous private security guard experience. Branum and Poynter testified that they viewed private security guard experience as more relevant that correctional officer or jailor experience. They also identified specific reasons why they believed that the experiences were not directly interchangeable. It is not unreasonable for an employer to find that previous experience in the position it seeks to fill is more relevant than experience in a similar field.

The circumstances surrounding AutoZone's decisions to interview and hire individuals for security guard positions explain why some men whose qualifications were arguably equivalent to Sheets' and Thomas-Dickens' were interviewed and hired when Sheets and Thomas-Dickens were not. The interview and hiring process at AutoZone was dynamic and on-going.

Candidates were not considered together and ranked one through one-hundred-and-fifty in order of qualification.  Branum and Poynter could have viewed candidates with identical qualifications differently depending on the time, the day, or other circumstances, such as the current mix of resumes recently received.  AutoZone's process was not perfect, but the law does not require that it be.  See Smith, 155 F.3d at 807 ("[W]e do not require that the decisional process used by the employer be optimal or that it left no stone unturned.")

Even proof that Sheets and Thomas-Dickens were actually better qualified than the men hired would be insufficient to establish pretext, if AutoZone honestly believed that the individuals it interviewed and hired were better qualified, so long as AutoZone made a reasonably informed and considered decision.  Ladd v. Grand Trunk Western R.R., Inc., 552 F.3d 495, 503 (6th Cir. 2009) (citing Allen v. Highlands Hosp. Corp., 545 F.3d 387, 398 (6th Cir. 2008)).  That several individuals who were interviewed and hired, such as Hicks, Stone, and McCarty, had qualifications similar to Sheets and Thomas-Dickens, is not sufficient to prove by a preponderance of the evidence that AutoZone was motivated to interview and hire them because of their gender.  The EEOC's evidence does not demonstrate that AutoZone did not make considered decisions based on the facts

before it and in light of the circumstances the recruiters faced when making interview and hiring decisions.

This conclusion is further supported by evidence that many of the men AutoZone did not hire had more of the qualifications AutoZone sought than Sheets or Thomas-Dickens.  For example, Purvis had more private security experience than Sheets or Thomas-Dickens, a degree in criminal justice, and military experience.  Donnell, Fayne, and Causley also had more private security experience than Sheets or Thomas-Dickens.  Hudson's experience is similar to Sheets' and Thomas-Dickens', but Poynter and Branum could have considered him a superior candidate because he listed private security experience. Williams was better qualified for the security guard position than Sheets or Thomas-Dickens because of his private security experience.

The EEOC has failed to prove by a preponderance of the evidence that AutoZone's decision to interview and hire male applicants instead of the two female claimants was based on gender and not on the males' superior qualifications.  Many candidates, including many of the males AutoZone did not hire, could be considered better qualified than some of the applicants AutoZone did hire.  Comparing those males with the experience most comparable to Sheets' and Thomas-Dickens' experience, the evidence is insufficient to establish that AutoZone's interview

and hiring decisions were based on gender.  The males hired had
different qualifications that could have made them appear better
qualified for security guard positions than Sheets or Thomas-
Dickens.  The EEOC has not proven by a preponderance of the
evidence that gender rather than individual qualifications
actually motivated AutoZone's interview and hiring decisions.

### 3. Insufficient to Warrant

The EEOC does not argue that AutoZone's proffered
legitimate, non-discriminatory reason was insufficient to
warrant its decisions, except to the extent that the EEOC argues
that AutoZone's reason was insufficient to actually motivate
AutoZone's decisions.  This argument is analyzed in Part IV.C.2
supra.  Sheets and Thomas-Dickens were not so clearly better
qualified than the males AutoZone chose to interview and hire
that the males' qualifications could not have warranted
AutoZone's choice to interview and hire them instead.

The EEOC has failed to prove by a preponderance of the
evidence that AutoZone's stated legitimate, non-discriminatory
reason for choosing males over Sheets and Thomas-Dickens is a
pretext for gender discrimination.  The EEOC has, therefore, not
proven by a preponderance of the evidence that AutoZone
discriminated against the claimants, Shelly Sheets and Annette
Thomas-Dickens, when it failed to hire them as security guards
in late 1994 and early 1995.

## V.    CONCLUSION

The only matters remaining before the Court are the claims of discrimination the EEOC has brought on behalf of Shelly Sheets and Annette Thomas-Dickens.  For the foregoing reasons, the Court finds for the Defendant AutoZone, Inc. and against the Plaintiff Equal Employment Opportunity Commission.  This concludes the case.  Both claims are dismissed with prejudice. Plaintiff shall pay all costs of the proceeding.  Let judgment enter.

So ordered this 20th day of March, 2009.

s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE